**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
EL PASO DIVISION**

| | | |
|---|---|---|
| **AJAI AGARWAL AND DIVYA AGARWAL,** | § § § | |
| **Plaintiffs,** | § § | |
| **v.** | § § | **EP-07-CV-373-KC** |
| **JANET NAPOLITANO, Secretary of the Department of Homeland Security,** *et al.*, | § § § § | |
| **Defendant**s. | § § | |

## <u>ORDER</u>

On this day, the Court considered Defendants' "Motion to Dismiss Plaintiffs' Complaint And/Or For Summary Judgment" ("Motion") (Doc. No. 39).  For the reasons set forth herein, the Motion is **DENIED**.  Additionally, the decisions of United States Citizenship and Immigration Services, dated May 4, 2009, denying the naturalization petitions of Ajai and Divya Agarwal, are hereby **VACATED** as *ultra vires*.

## I.      BACKGROUND

Ajai and Divya Agarwal ("Agarwals") are natives and citizens of India.  Defs.' Reply Ex. A at 13 (Doc. No. 46).  Ajai Agarwal first entered the United States on a J-1 visa on June 29, 1992.  Defs.' Mot. 1.  Divya Agarwal first entered the United States on a J-2 visa on August 23, 1992.  *Id.* at 2.  Ajai and Divya Agarwal currently live in El Paso, Texas; Ajai works as a physician at the Montwood Medical Center, and Divya works as an office manager.  Pls.' Compl.

¶¶ 8-9 (Doc. No. 2).

The Agarwals applied to the U.S. Citizenship and Immigration Services ("CIS") for naturalization as U.S. citizens in July 2004, were interviewed in November 2004, and passed their language, history and civics tests at that time. Defs.' Answer ¶¶ 8-9. No action having been taken on their application for some time, the Agarwals proceeded to file suit in this Court on October 29, 2007, naming various CIS and Department of Homeland Security officials as Defendants,[1] seeking relief from agency delay, and requesting judicial determination of their citizenship applications under 8 U.S.C. § 1447(b). Pls.' Compl. ¶¶ 5-6.

On May 4, 2009, during the pendency of this suit, the CIS issued decisions denying the Agarwals' applications for naturalization. Defs.' Mot. 3; *Id.* Exs. 1, 2; Defs.' Reply Ex. A at 1, 9. On June 9, 2009, the CIS served Ajai and Divya Agarwal each, by mail, a Notice to Appear in Removal Proceedings. Defs.' Reply Ex. A at 5; *Id.* Ex. E. On June 30, 2009, the CIS filed the instant Motion seeking, in the alternative, dismissal of the Agarwals' suit, or a grant of summary judgment declaring them ineligible for citizenship. Defs.' Mot. 1.

II.     **DISCUSSION**

A.     **Standards**

The CIS moves for dismissal for lack of subject matter jurisdiction based on mootness, for dismissal for failure to state a claim upon which relief may be granted predicated on the pendency of removal proceedings, and for summary judgment based on the Agarwals ineligibility for citizenship. The Court will address each claim in turn.

---

[1]     Throughout this memorandum, the collective defendants will simply be referred to through their organizational identity as the "CIS."

Federal courts are courts of limited jurisdiction. *People's Nat'l Bank v. Office of the Comptroller of the Currency of the United States*, 362 F.3d 333, 336 (5th Cir. 2004). Without jurisdiction conferred by statute, federal courts lack the power to adjudicate claims. *Id.* Furthermore, "[i]f a case has been rendered moot, a federal court has no constitutional authority to resolve the issues that it presents." *Envtl. Conservation Org. v. Dallas*, 529 F.3d 519, 525 (5th Cir. 2008). When determining whether a case is moot, courts are advised that "[a]s a general rule, any set of circumstances that eliminates actual controversy after the commencement of a lawsuit renders that action moot." *Id.* at 527 (internal quotation marks and citations omitted). A party may challenge a district court's subject matter jurisdiction by filing a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(1).

A motion to dismiss pursuant to Rule 12(b)(6), on the other hand, challenges a complaint on the basis that it fails to state a claim upon which relief may be granted. FED. R. CIV. P. 12(b)(6). In ruling on a Rule 12(b)(6) motion, the court must accept well-pleaded facts as true, and view them in a light most favorable to the plaintiff. *Calhoun v. Hargrove*, 312 F.3d 730, 733 (5th Cir. 2002)*; Collins v. Morgan Stanley Dean Witter*, 224 F.3d 496, 498 (5th Cir. 2000). A Rule 12(b)(6) motion which presents "matters outside the pleadings . . . must be treated as one for summary judgment under Rule 56. FED. R. CIV. P. 12(d); *see also Minvielle v. IMC*, 380 F. Supp. 2d 755 (W.D. La. 2004).

Summary judgment is required "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Warfield v. Byron*, 436 F.3d

551, 557 (5th Cir. 2006).  The substantive law identifies which facts are material.  *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248,(1986); *Ellison v. Software Spectrum, Inc.*, 85 F.3d 187, 189 (5th Cir. 1996).  A dispute about a material fact is genuine only "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248; *Ellison*, 85 F.3d at 189.

"[The] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact ." *Celotex*, 477 U.S. at 323; *Wallace v. Texas Tech. Univ.*, 80 F.3d 1042, 1046-1047 (5th Cir. 1996).  If the moving party meets its initial burden, the nonmoving party "must set forth specific facts showing that there is a genuine issue for trial." FED. R. CIV. P. 56(e).  The nonmovant's burden may not be satisfied by "conclusory allegations, unsubstantiated assertions, or only a scintilla of evidence." *Warfield*, 436 F.3d at 557 (quoting *Freeman v. Texas Dep't of Crim. Justice*, 369 F.3d 854, 860 (5th Cir. 2004)).  Factual controversies are to be resolved in favor of the nonmovant, "but only when there is an actual controversy, that is, when both parties have submitted evidence of contradictory facts." *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994)  (en banc).  Thus, the ultimate inquiry in a summary judgment motion is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law."  *Anderson*, 477 U.S. at 251-52.

### B.    Mootness

The CIS argues that the Agarwals' claims are moot because they received all of the relief that they were entitled to when their naturalization applications were decided by the CIS on May

4, 2009.  Defs.' Mot. 5.  This claim rests on the assumption that the CIS retained the necessary authority and jurisdiction to effectively decide these applications on that date, and the CIS so asserts.  Defs.' Reply 3.

Petitions for naturalization, when filed, are initially under the sole jurisdiction of the CIS, which has the power to grant or deny naturalization to an alien applicant.  *See* 8 U.S.C. § 1421(a).  After this initial period of CIS jurisdiction, a district court may obtain jurisdiction over a petition either by way of appeal from an unfavorable agency decision, 8 U.S.C. § 1421(c)) or, in cases where the agency has not acted on an application within 120 days of the alien's in-person interview, by way of a suit filed under 8 U.S.C. § 1447(b).  The key question is whether an alien's filing of a § 1447(b) suit vests exclusive jurisdiction over the petition in the district court hearing the suit, implicitly divesting the CIS of all power in the matter, or whether the filing of such a suit creates concurrent jurisdiction over the matter, shared between the district court and the tardy agency.

This Court holds that the filing of a § 1447(b) suit vests the Court with exclusive jurisdiction over the matter.  The weight of precedent as well as reason falls on this side.  First, regarding precedent, the two Circuit Courts of Appeal which have directly addressed this question – the Fourth and Ninth Circuits – have both held for exclusive jurisdiction.  *See Etape v. Chertoff*, 522 F.3d 379 (4th Cir. 2007) ("§ 1447(b) vests exclusive jurisdiction in the district court"); *see also United States v. Hovsepian*, 359 F.3d 1144 (9th Cir. 2004) (en banc) (same).  The Tenth Circuit has also agreed with this premise, though in *obiter dictum*.  *Al-Maleki v. Holder*, 558 F.3d 1200, 1205 n.2 (10th Cir. 2009) (finding the reasoning of the Fourth and Ninth Circuits to be persuasive such that it "casts serious doubt on the Government's concurrent

jurisdiction argument"). While the Fifth Circuit has not directly addressed this issue, this Court has recently held that exclusive jurisdiction lies, and the Court sees no persuasive reason to reverse its position now. *Castro v. Napolitano*, No. 3:09-cv-39, (W.D. Tex. Sept. 16, 2009) (El Paso Div.) (Montalvo, J.). At least one other district court in the Fifth Circuit has also held for exclusive jurisdiction. *See Dimopoulos v. Blakeway*, No. 2:07-cv-127, 2007 WL 922224 (S.D. Tex. Mar. 23, 2007). None have held for concurrent jurisdiction.

Moving further afield, this Court has found eighteen other cases in which a district court ruled in favor of exclusive jurisdiction. *See Al-Atiyeh v. Swacina*, --- F. Supp. 2d ----, 2009 WL 2842740 (S.D. Fla. Aug. 31, 2009) (holding that a § 1447(b) suit vests the district court with exclusive jurisdiction); *Escobar v. Chertoff*, No. 07-cv-10851, 2008 WL 2066938 (D. Mass. May 14, 2009) (same); *Taalebinezhaad v. Chertoff*, 581 F. Supp. 2d 243 (D. Mass. 2008); *Khezri v. Ward*, No. 4:07-cv-148, 2008 WL 867740 (N.D. Okla. Mar. 27, 2008) (same); *Haring v. Att'y General*, No. 6:07-cv-1764, 2008 WL 822003 (M.D. Fla. Mar. 26, 2008) (same); *Sallam v. Mukasey*, No. 07-cv-11380, 2008 WL 687409 (D. Mass. Mar. 5, 2008) (same); *Aarda v. USCIS*, No. 0:06-cv-1561, 2008 WL 53280 (D. Minn. Jan. 1, 2008) (same); *Elaasar v. Mueller*, 522 F. Supp. 2d 932 (N.D. Ohio 2007) (same); *Li v. Chertoff*, 490 F. Supp. 2d 130 (D. Mass 2007) (same); *Izraileva v. Chertoff*, No. 8:07-cv-21, 2007 WL 3120255 (M.D. Fla. Oct. 23, 2007) (same); *Frenkel v. United States Dep't of Homeland Security*, No. 3:07-cv-1145, 2007 WL 3090656 (D. Conn. Oct. 19, 2007) (same); *Kalla v. Chertoff*, No. 1:06-cv-1732, 2007 WL 415157 (N.D. Ga. Feb. 6, 2007) (same); *Alghamdi v. Ridge*, No. 3:05-cv-344, 2006 WL 5670940 (N.D. Fla. Sept. 25, 2006) (same); *Meyersiek v. USCIS*, No. 05-cv-398, 2006 WL 1582397 (D.R.I. June 6, 2006) (same); *Meraz v. Comfort*, No. 05-cv-1094, 2006 WL 861859 (N.D. Ill.

Mar. 9, 2006) (same); *Castracani v. Chertoff*, 377 F. Supp. 2d 71 (D.D.C. 2005) (same);

*Zaranska v. United States Dep't of Homeland Security*, 400 F. Supp. 2d 500 (E.D.N.Y. 2005)

(same); *Saidi v. Jenifer*, No. 2:05-cv-71832, 2005 WL 5179147 (E.D. Mich. Dec. 23, 2005).

This Court has only found eight cases which hold for concurrent jurisdiction. *See Hassan v.*

*Holder*, No. 08-cv-4870, 2009 WL 2253017 (E.D.N.Y. July 28, 2009) (holding that the district

court has concurrent jurisdiction with the CIS after a § 1447(b) suit is filed); *Ali v. Henning*, No.

08-cv-2209, 2009 WL 1507685 (D. Minn. May 4, 2009) (same); *Bello-Camp v. Att'y General*,

No. 8:08-cv-885, 2009 WL 813146 (M.D. Fla. Mar. 26, 2009) (same); *Bustamante v. Chertoff*;

553 F. Supp. 2d 373 (S.D.N.Y. 2008) (same); *Xie v. Mukasey*, 575 F. Supp. 2d 963 (E.D. Wis.

2008); *Fatayer v. Swacina*, No. 2:07-cv-527, 2008 WL 4279688 (M.D. Fla. Sept. 15, 2008)

(same); *Perry v. Gonzales*, 472 F.Supp. 2d 623 (D.N.J. 2007) (same); *Farah v. Gonzales*, No. 05-

cv-1944, 2006 WL 1116526 (D. Minn. Apr. 26, 2006) (same).

Beyond the mere weight of precedent, the Court finds the reasoning of the Fourth Circuit

in *Etape* to be persuasive. 497 F.3d at 383. This reasoning starts with the language of the statute

itself, which states in pertinent part:

> If there is a failure to make a determination under section 1446 of this title before the end
> of the 120-day period after the date on which the examination is conducted under such
> section, the applicant may apply to the United States district court for the district in which
> the applicant resides for a hearing on the matter. Such court has jurisdiction over the
> matter and may either determine the matter or remand the matter with appropriate
> instructions to the [CIS] to determine the matter.

8 U.S.C. § 1447(b).

The critical part of the statute, for these purposes, is the use of the term "remand" to describe one

of the options that the district court has when disposing of the case. As the Fourth Circuit points

out, "remand" implies a hierarchy, and the ability to "send back" a matter. *Etape*, 497 F.3d at

383-84.  Both of these concepts would be undercut if the CIS retains the power all along to act on

the application.  *See id*.  On a functional note, the *Etape* court also observed that the power of a

district court to issue a remand with specific instructions would be vitiated if the CIS could act

contrary to those instructions after the court's intentions become clear but before its order

became final.  *Id.* at 384.  The Fourth Circuit found that this would render the remand-with-

instructions part of the statutory scheme ineffective or meaningless, which would be an

unacceptable result.  *Id*.  Finally, this Court observes that construing the statute to provide

concurrent jurisdiction would create a disincentive for the parties and the Court to invest

adequate time and resources to consider the matter properly, knowing that at any moment the

proceedings could be rendered moot, with so much effort wasted, by an eleventh-hour CIS

action.

The CIS, in the instant Motion, leans heavily on the reasoning in *Bustamonte v. Chertoff*,

533 F. Supp. 2d 373 (S.D.N.Y. 2008) to support the contention that concurrent jurisdiction is the

correct and expeditious reading of the statute.  But the reasoning in that opinion is not

convincing.  The *Bustamonte* court first observed that the vesting clause of the statute ("[s]uch

court has jurisdiction over the matter") does not clearly favor exclusive jurisdiction over

concurrent jurisdiction, but that it is ambiguous.  *Id.* at 376.  This contention is reasonable;

however, resolving the ambiguity in favor of concurrent jurisdiction is not, because the rest of the

statutory scheme tilts in favor of an exclusive jurisdiction reading.

The use of the term "remand," as noted above, strongly suggests a model of exclusive

jurisdiction.  The *Bustamonte* court attempts to reconcile the use of that term with concurrent

jurisdiction by stating that the district court's remand option remains a way to "send a message to

the tardy agency." *Id.* at 378. The opinion goes on to observe that a remand to the CIS with instructions to make a decision before a certain deadline would be consistent with concurrent jurisdiction – if the CIS acted before the remand order was even entered, it certainly would be ahead of the deadline, and thus the district court's purposes would be served. *Id.* If the CIS did not act even after the order was issued and even after the deadline passed, then the court has the power to hale the agency back to explain itself. *Id.* But that analysis misses the possibility that a court could want to remand a naturalization petition with instructions that are more specific than setting a deadline. In such a case, a CIS action taken during the pendency of the matter that runs contrary to the contemplated instructions would undercut the court's statutory power to "remand the matter with appropriate instructions." *See Etape*, 497 F.3d at 384. The power to remand is more than the mere power to prod, and the *Bustamonte* court loses sight of this.

The *Bustamonte* court goes on to argue that concurrent jurisdiction is consonant with the legislative history and purpose of the current statutory naturalization scheme. *Bustamonte*, 533 F. Supp. 2d at 378. That court first observed that a major purpose behind the 1990 overhaul of the naturalization system was to speed the processing of applications by removing from the overtaxed district courts the task of determining each application, leaving the courts only with jurisdiction over appeals from CIS denials, and jurisdiction over delayed cases. *Id.* The *Bustamonte* court goes on to argue that vesting the district courts with exclusive jurisdiction after the filing of a § 1447(b) suit would frustrate this purpose of efficiency. *Id.* at 379-80. That court observed that the filing of such a suit usually "prods [the CIS] into making a decision," and that this "prod," and not an actual determination by the courts (or even a formal remand with instructions, it seems), is what applicants are typically seeking when they file these suits. It

concluded exclusive jurisdiction would render impossible such "speedy solutions." *Id.* at 379. But this is unconvincing: Nothing prevents the CIS and the applicant from speedily settling the matter and jointly withdrawing the case at any point after it is filed. Nothing prevents an applicant, first frustrated by CIS delays and then frustrated by any potential court delays, from unilaterally withdrawing a suit and giving the matter back to the agency in hope of swift action. Nothing prevents a court, on anyone's motion, from remanding the matter to the CIS early on, if prompt and proper action appears to be in the offing. The only thing that is lost is the power of the CIS to bind the court and the applicant to a potentially hasty and improper decision made in the shadow of litigation. This Court does not place a high value on that sort of speed.

For the foregoing reasons, the Court holds that 8 U.S.C. § 1447(b) vests the district courts with exclusive jurisdiction over naturalization petitions once a suit has been filed. As such, the purported CIS adjudications of the Agarwals' naturalization petitions, issued during the pendency of this suit on May 4, 2009, are void as *ultra vires*. Those decisions are hereby vacated, and the Agarwals are held not to have been required to take administrative appeals from them. The CIS cannot act on these petitions unless and until jurisdiction is returned to it, and the instant suit is not dismissed as moot.

### C.     Pending Removal Proceedings

An alien's petition for naturalization cannot be considered once removal proceedings have commenced, pursuant to statutory law. 8 U.S.C. § 1429. This prohibition applies equally to the CIS as well as to the courts. *Saba-Bakare v. Chertoff*, 507 F.3d 337, 340 (5th Cir. 2007).

The CIS argues, in the context of the instant Motion,[2] that this case should be dismissed because removal proceedings have recently been brought against both Agarwals.  Defs.' Reply 4.

While there is some uncertainty over whether this amounts to a jurisdictional matter, the general view, not contested by either party here, is that the institution of removal proceedings does not rise to the level of creating a jurisdictional defect in a pending district court immigration case.  *See Saba-Bakare*, 507 F.3d at 340 (holding that invoking § 1447(b) jurisdiction by filing suit *even after* removal proceedings have commenced would be "futile," but that jurisdiction is not necessarily non-existent); *see also Zayed v. United States*, 368 F.3d 902, 906 (6th Cir. 2004) ("The effect of § 1429, in our view, is to limit the scope of the court's review and circumscribe the availability of effective remedies, but not to oust the district court of a jurisdiction expressly conferred on it by the very act of Congress that amended § 1429."); *see also Ajlani v. Chertoff*, 545 F.3d 229 (2nd Cir. 2008) (citing *Zayed* with approval).  Though the CIS avoids construing this issue as jurisdictional and instead characterizes this claim as arising under Rule 12(b)(6), the Court treats it as a Rule 56 Motion for Summary Judgment because all of the allegations, evidence and facts on the subject of the Agarwals' removal proceedings are outside of the responsive pleadings.  *See* Fed. R. Civ. P. 12(d); *see also Minvielle v. IMC*, 380 F. Supp. 2d 755 (W.D. La. 2004).

The essence of the CIS's argument is that removal proceedings were brought against the Agarwals starting on June 9, 2009, rendering the Court powerless to consider their applications at

---

[2]     This point was not raised in the initial Motion. It appears only in the Reply Brief. This Court observes that these developments are not so chronologically recent that it would have been impossible to mention them in the initial filing – the Notices to Appear in Removal Proceedings are dated June 9, 2009, while the initial brief in the instant Motion is dated June 30, 2009.

this time, under the rule of 8 U.S.C. § 1429.  The CIS cites to two Notices to Appear in Removal

Proceedings, filed in an exhibit, as proof that removal proceedings have indeed been instituted

against the Agarwals:  "Plaintiffs cannot state a claim for relief under § 1447(b) because removal

proceedings are pending against them.  (Exhibit E)."  Defs.' Reply 4; *see* Defs.' Reply Ex. E

(Notice to Appear addressed to Divya Agarwal); *see also* Defs.' Reply Ex. A at 5 (Notice to

Appear addressed to Ajai Agarwal).

 The CIS's claim fails because it has not met its burden on summary judgment.

Throughout its argument, the CIS fails to allege, and adduce evidence for, all of the elements of a

valid removal proceeding – the law of removal proceedings being the relevant "substantive law"

in this case.  *See Anderson*, 477 U.S. at 248.  The Court cannot simply assume the existence of

such critical facts; the law requires support to be brought from evidence in the "pleadings,

depositions, answers to interrogatories, and admissions on file, together with [any] affidavits."

*Celotex*, 477 U.S. at 322.

 Critically, the Fifth Circuit has held that removal proceedings "commence" when the

regulations say they commence; that is, upon the filing of the Notice to Appear with the

Immigration Court.  *DeLeon-Holguin v. Ashcroft*, 253 F.3d 811, 814 (5th Cir. 2001) ("We

therefore hold that removal proceedings commence when the [CIS] files the appropriate charging

document with the immigration court."); *see also* 8 C.F.R. § 1239.1 ("Every removal proceeding.

. . to determine the deportability or inadmissibility of an alien is commenced by the filing of a

notice to appear with the immigration court.").  The relevant statute also provides that a copy of

the notice to appear "shall be given in person to the alien (or, if personal service is not

practicable, through service by mail to the alien or to the alien's counsel of record, if any)."  8

U.S.C. § 1229.  Thus, the substantive law of this issue identifies at least two groups of material

facts which the CIS must demonstrate in order to show that removal proceedings were actually

and properly commenced:  First, that proper charging documents were filed with the immigration

court as to the Agarwals, and second, that copies of the Notices to Appear were properly served

on the Agarwals.

In the instant case, the CIS has not even alleged that the Notices to Appear, copied in the

exhibits attached to their Reply, were properly filed with the immigration court.  Nor has the CIS

pointed to a scrap of evidence tending to prove this point.  Furthermore, while the copied Notices

to Appear do contain certificates of service showing that they were served by regular mail on the

Agarwals on June 9, 2009, the CIS has neither alleged nor brought evidence to show that

personal service was attempted, or found actually impracticable, as required by 8 U.S.C. § 1229.

Because the CIS fails to submit *any evidence* on these two critical substantive-law issues, the

Court finds that the agency has not carried its burden of proof to demonstrate that removal

proceedings have actually commenced.  The Court will therefore not cease consideration of this

matter for such a reason.[3]

---

[3]      It should be noted that the result is essentially the same even if this issue is
deemed jurisdictional and subject to a Rule 12(b)(1) Motion to Dismiss for Lack
of Subject Matter Jurisdiction.  When considering this issue under that standard,
the court may consider the (1) the complaint alone; (2) the complaint
supplemented by undisputed facts evidenced in the record; or (3) the complaint
supplemented by undisputed facts plus the court's resolution of disputed facts.
*Ramming v. U.S.*, 281 F.3d 158, 161 (5th Cir. 2001).  Here, the complaint alone
does not provide the basis of the argument, and the government is clearly
pointing to external facts – the alleged commencement of removal proceedings.
Even if the Plaintiff here did not have a chance to dispute these facts, because
they were only raised after the Plaintiff had a chance to speak, the relevant facts
are still not sufficiently "evidenced in the record," and the mere allegation, in a
Reply, that removal proceedings have commenced cannot carry this Motion.

### D.    Lawful Permanent Resident Status

The Government claims that the Agarwals are not Lawful Permanent Residents for two reasons.  First, the Government  states that the Agarwals' Legal Permanent Resident status was *void ab initio*.  Second, the Government argues in the alternative that it recently revoked their status.  The Court addresses these claims in turn.

### 1.    The Agarwals' Lawful Permanent Resident Status was not *void ab initio*

The CIS argues that the Agarwals are not actually Lawful Permanent Residents ("LPRs"), and were not at the time they applied for naturalization; as such they were and are ineligible for citizenship.  Defs.' Mot. 6.  This claim is also analyzed under the summary judgment standard and is denominated as such in the Motion.  The CIS makes this contention solely through reference to the copies of the May 4, 2009 memoranda of decision on the naturalization petitions that are filed as exhibits with the instant Motion.  Defs.' Mot. Exs. 1, 2 (unsigned, undated copies of memoranda of decision, without certificates of service); Defs.' Reply Ex. A at 1, 9 (signed, dated memoranda of decision, with certificates of service).  The substance of those decisions is set out below in order to more fully understand why the CIS believes the Agarwals were not and are not now lawful permanent residents.

The memoranda state that in March of 1996, when Dr. Agarwal applied for LPR status, he failed to pay the enhanced fee required under 8 U.S.C. § 1255(i), rendering the green card that he was subsequently and erroneously issued null and void.  Defs.' Mot. Ex. 1 at 4.  The reason Dr. Agarwal should have paid the enhanced § 1255(i) fee, the CIS contends, is that he was engaged in unauthorized employment in the period immediately prior to his March 1996 LPR

application, and the enhanced fee was meant to be collected from such persons;[4] persons not

engaged in unauthorized work are only assessed the regular fee.  *Id.*  The CIS goes on to state

that the reason that period of employment was unauthorized was that Dr. Agarwal had failed to

obtain the non-immigrant skilled worker ("H1B") visa status he had sought in 1995.  *Id.*  While

an application to change status was filed on his behalf at that time, the CIS states that, after the

application was reviewed, he was instructed to leave the country to obtain an H1B visa abroad

and then re-enter, and not to rely on an in-place change of status.  *Id.* at 3-4.  The CIS then notes

that Dr. Agarwal never left the country to do this.  *Id.* at 4.  Without H1B status, the CIS

contends, his employment was unauthorized starting in February 1996, when his J-1 visa –

originally granted in 1992 – expired.  *Id.* at 3.  Apparently the agency did not notice the invalidity

of Dr. Agarwal's H1B status (and the month of unauthorized work he performed before applying

for LPR status in March 1996) and did not demand the statutory fee from him at any point during

the year it was considering his LPR application.  It granted Dr. Agarwal and his wife (as a

derivative beneficiary) LPR status in April of 1997.  Because of this long chain of errors, the CIS

claims, Dr. Agarwal and his wife were not and are not actual LPRs, and are not eligible for

naturalization.[5]

---

[4]     This policy of collecting an enhanced fee in order to excuse unauthorized
employment and allow an alien to gain lawful permanent resident status has
since been changed, but it was in force in 1996 during the time of Dr. Agarwal's
application for lawful permanent residency and still applies to his case.  *See* 8
C.F.R. § 245.10(a)(1).

[5]     The CIS further contends, regarding Divya Agarwal alone, that while her
application for naturalization was initially approved on November 9, 2004, it
was re-opened for correction on November 24, 2004, and that on December 6,
2007 – three years later, and during the pendency of this suit, which was initially
filed on October 29, 2007 – it sent her a notice of an appointment for a new
examination, to be held on January 3, 2008.  Defs.' Mot. Ex. 2 at 3.  Divya did
not appear at this appointment, and the agency closed the application one year

The first problem with these contentions is that they contradict the responsive pleadings. The Answer states that "Defendants admit that Plaintiff Ajai Agarwal is a lawful permanent resident" and goes on to state that "Defendants admit that Plaintiff Divya Agarwal is a lawful permanent resident." Defs.' Answer ¶¶ 8-9. There is no possible way to reconcile these statements with the claim that Plaintiffs never properly obtained lawful permanent resident status. Since admissions in the pleadings are deemed "conclusively binding on the party who made them," this Court holds that the Agarwals did obtain lawful permanent resident status in 1997, that they maintained that status through to the time of suit, and that the CIS's unseasonable averments to the contrary carry no weight. *See White v. ARCO/Polymers*, 720 F.2d 1391, 1396 (5th Cir. 1983).

The second problem with these contentions is that, on their own terms, the premises and stated factual allegations should not give rise to the legal result that the CIS advocates. The agency essentially contends that Dr. Agarwal's failure to pay a fee that was never demanded of him should automatically and retroactively cut off his – and his wife's – lawful permanent resident status, rendering them both ineligible for citizenship. Not only is this scenario Kafkaesque, it is also contrary to law in two distinct ways.

The first problem is the CIS's failure to notify the Agarwals of the missing payment. According to the regulations, the agency must notify an alien of any failure to remit a § 1255(i) enhanced fee, if the alien is not otherwise ineligible for relief, and provide the alien with thirty

---

later, deeming it abandoned. *Id.* This argument is of little weight. Because this Court had exclusive jurisdiction over the Agarwals' petitions once the instant suit was filed, see the discussion at section II(B), *supra*, the CIS had no power to conduct interviews or act on the application at that point.

days to cure this defect. 8 C.F.R. § 245.10(d). Because the CIS alleges no other defect in the Agarwals' LPR process, at the very minimum it was required to give them the benefit of the § 245.10(d) notice and cure provisions while their LPR applications were pending. There is no suggestion that the agency complied with that regulation. In fact, there is no evidence the CIS even noticed this defect until at least a decade after the Agarwals received LPR status, after this suit had been filed.

Had the applications simply been denied in 1997 for failure to pay the § 1255(i) enhanced fee, the Agarwals could have unquestionably complained about a failure to provide the notice mandated by 8 C.F.R. § 245.10(d), and gained relief at the time. Should their position now be the worse because the agency erroneously *granted* the petitions in 1997? That result should not be permitted, as it would essentially gut the notice provision by allowing the CIS to grant and then immediately rescind LPR status without providing the required notice – the agency could do that in every case and be spared the burden of ever having to provide notice.

The reasoning in *Dzandu v. Gonzales*, 126 F. App'x. 354 (9th Cir. 2005) (unpublished) is also persuasive on this point. In that case, the INS[6] granted lawful permanent resident status to an alien after erroneously failing to collect the applicable enhanced fee under § 1255(i). Shortly after granting the adjustment in status, the agency realized this error and acted to rescind the status. *Id.* at 357. After giving her notice of this proposed rescission, receiving her reply in which she requested a hearing, and failing to grant her the requested hearing – though it was required by the rescission regulations – the INS summarily rescinded her LPR status. *Id.* It then

---

[6]    In this case, the agency in question was the Immigration and Naturalization Service ("INS"), the predecessor agency to the CIS.

-17-

placed her in removal proceedings, as without LPR status she would have to rely on her previous visa, which had by then expired. *Id.*

The appeals court stopped the removal proceedings and held that the agency's failure to give the alien timely notice of her need to pay the § 1255(i) fee was likely unlawful, since the notice was meant for her benefit and the lack of it probably prejudiced her. *Id*. at 358-59. It then remanded the case for what was essentially a rescission hearing, in which it was to be determined if she was actually prejudiced by the failure to provide the required notice; that is, if there was evidence to show she would have been willing and able to pay the fee had she been given notice at the time. *Id.* The court held that if she showed that she would have paid the fee if notified, then she should keep her LPR status, notwithstanding the lack of payment at the time. *Id.* In the instant case, the agency's failure to notify Dr. Agarwal of the missing § 1255(i) payment appears equally prejudicial – the CIS has made the lack of that payment the linchpin of their argument concerning the Agarwals' lack of LPR status, and the agency has not shown that notice was provided. Following the reasoning of *Dzandu*, then, the Court holds that the CIS's failure to submit evidence that they provided the required notice prevents the agency from prevailing on its motion for summary judgment.

The CIS's view regarding the automatic loss of erroneously-granted LPR status is also incorrect for a second, broader reason. The law plainly states that, once granted, LPR status sticks; if the CIS later realizes that the alien was actually ineligible for that adjustment in status at the time of granting (i.e. it was granted erroneously) then it must follow the formal procedure for revocation or rescission. *See* 8 C.F.R. § 246.1 ("If it appears to a district director that a person residing in his or her district *was not in fact eligible* for the adjustment of status made in his or

-18-

her case [then the listed procedures are to be followed].") (emphasis added). This strongly suggests that there is only one way to set aside a grant, even an erroneous grant, of LPR status – a formal rescission proceeding. Simply ignoring LPR status after it is granted, as the CIS did in its decisions on the Agarwals' applications, and as the agency urges this Court to do here, is inappropriate.

Thus, because (1) the CIS's allegation that the Agarwals never truly had LPR status is contradicted by its own pleadings, (2) a rescission of LPR status predicated upon a failure to pay the required § 1255(i) fee, when the agency failed to provide the required notice, would be unjust and unlawful, and (3) the agency does not allege that the Agarwals lost their LPR status through the procedural avenue provided by law, the Court cannot conclude that the Agarwals are ineligible for citizenship because their LPR status was void from the start.

### 2.    The Agarwals' LPR Status was not recently revoked

The CIS, in its Reply, puts forward a related lack-of-LPR-status argument, contending that, even if Plaintiffs did have LPR status starting in 1997 and continuing through to the time of the Answer in 2008, the "status was revoked on May 4, 2009," through the naturalization application decisions issued at that point. This would make the Agarwals' presently ineligible for citizenship. Defs.' Reply 6. Thus, the CIS tries to circumvent the issues described above in section II(D)(1). But there are several problems with this argument.

First, the May 4, 2009 documents simply do not say what the CIS contends that they say. They do not state that LPR status is being "revoked;" rather, those documents assert that the Agarwals are not being granted citizenship because they never obtained LPR status in the first place. Defs.' Reply Ex. A at 4 (citizenship is denied "[b]ecause you were *not lawfully admitted*

to permanent residence. . . ") (emphasis added).  The letters do not formally *decide* anything about the Agarwals' LPR status; they state certain assumptions and conclusions about the Agarwals' LPR status, and use those conclusions as premises when arriving at a decision on the naturalization applications.  And the propositions the letters actually state about the Agarwals' LPR status – that they never had it – are not the propositions the CIS contends are there – that they had it but it was, or is being, revoked.

Second, attempting to revoke LPR status through those naturalization decisions, twelve years after the initial erroneous grant, would be impermissible under the relevant laws and regulations.  The procedure for revoking an alien's lawful permanent resident status is laid out at 8 C.F.R. § 246.  The first step in that procedure is personal service of notice upon the alien of an intent to commence revocation proceedings:

> If it appears to a district director that a person residing in his or her district was not in fact eligible for the adjustment of status made in his or her case. . . a proceeding shall be commenced by the personal service upon such person of a notice of intent to rescind, which shall inform him or her of the allegations upon which it is intended to rescind the adjustment of his or her status. . . . The notice shall also inform the respondent that he or she may submit, within thirty days from the date of service of the notice, an answer in writing under oath setting forth reasons why such rescission shall not be made, and that he or she may, within such period, request a hearing before an immigration judge in support of, or in lieu of, his or her written answer. The respondent shall further be informed that he or she may have the assistance of or be represented by counsel or representative of his or her choice. . . .

8 C.F.R. § 246.1.

Because the decisions issued on May 4, 2009 were styled as decisions on naturalization applications, if a revocation of LPR status is to be effected through them then the burden on the CIS seems especially high to show that the formalities of a revocation proceeding were observed. The CIS does not make any showing in this connection.

The final reason why this Court cannot construe the May 4, 2009 decisions as revoking that Agarwals' LPR status is that such a revocation would time barred. The statute setting out the power to revoke lawful permanent resident status specifies that the deadline for such an action is five years from the date of the adjustment of status:

> If, at any time within five years after the status of a person has been otherwise adjusted. . . to that of an alien lawfully admitted for permanent residence, it shall appear to the satisfaction of the Attorney General that the person was not in fact eligible for such adjustment of status, the Attorney General shall rescind the action taken granting an adjustment of status to such person.

8 U.S.C. § 1256; *see also Garcia v. Att'y General*, 553 F.3d 724 (3rd Cir. 2009) (holding that any rescission of LPR status is subject to the statute of limitations); *see also Asika v. Ashcroft*, 362 F.3d 264 (4th Cir. 2004) (holding that rescission of LPR status in every context, other than in removal proceedings predicated on an attack on the original adjustment to LPR status, is subject to the statute of limitations).

Since the Agarwals were initially granted LPR status in 1997, and the purported revocation took place in 2009 as an incident to the adjudication of their naturalization petitions, it is well beyond the five year limit and thus not permitted by law. For these reasons, then, this Court holds that the CIS has not proved that the Agarwals' LPR status was properly revoked, and since it has not been revoked, the Agarwals are not rendered ineligible for naturalization on such grounds.

## E.    Good Moral Character

The CIS's final contention is that the Agarwals are unable to demonstrate the good moral character required for naturalization. Defs.' Mot. 7. Though the burden of proof of eligibility is on the alien applicant, it is evident that this burden only needs to be carried upon a full investigation of the application. *See* 8 U.S.C. §§ 1427(a) (good moral character requirement), 1446(b) (providing for examination by agency employees on "any matter. . . affecting the admissibility of any applicant for naturalization"); *see also* 8 C.F.R. §§ 316.2b (burden of proof

on alien for "all of the requirements for naturalization), 316.10(a)(1) (burden of proof on alien to show moral character, including for the period between examination and admission as a citizen). Since this is a motion for summary judgment, and not a full examination of the applications, the CIS has the burden of showing that the Agarwals *cannot* demonstrate good moral character when called upon to do so. *See Nyari v. Napolitano*, 562 F.3d 916 (8th Cir. 2009). It is not enough to merely show that there is some evidence that they lack moral character; the CIS must show that there is no genuine issue of material fact, and that they are entitled to judgment as a matter of law. *See id.*

When arguing this issue, the CIS cites to 8 U.S.C. § 1101(f) and 8 C.F.R. § 316.10, which discuss the good moral character requirement. Defs.' Mot. 7-8. The regulation, which expands upon and implements the statute, provides that demonstrating certain facts about an applicant conclusively precludes a showing of good moral character. 8 C.F.R. §§ 316.10(b)(1) (good moral character precluded if the alien has been convicted of certain crimes), 316.10(b)(2) (good moral character precluded for certain acts committed during the statutory look-back period). The regulation also provides that certain other facts raise a rebuttable presumption against finding good moral character. *Id.* § 316.10(b)(3). The statute and regulations also provide that, even if an applicant does not fall within one of these enumerated categories, he can still be found to lack good moral character based on the totality of the evidence in his case. *See* 8 U.S.C. § 1101(f); *see also* 8 C.F.R. § 316.10(a)(2). Showing that an alien is disqualified under one of the *per se* or presumptive categories of § 316.10(b) is the typical way for the CIS to prevail on a motion for summary judgment, because once one of those facts is proved (and, in the case of the presumptive categories, if no evidence in rebuttal is submitted), there is no way for the alien to

prevail.  *See, e.g., United States v. Dang*, 488 F.3d 1135 (9th Cir. 2007) (holding that committing the unlawful acts of arson, fraud and willful injury of a child during the statutory period, for which the alien was later convicted, demonstrated a lack of good moral character under 8 C.F.R. § 316.10(b)(3)(iii) and also holding that disposing of the case on these grounds was appropriate on summary judgment).

The CIS argues that the Agarwals lack good moral character because of their alleged involvement in Medicare fraud.  Defs.' Mot. 7-8.  To substantiate these allegations, the CIS refers to a "multi-year fraud investigation" of which the Agarwals were the targets, and furnishes a copy of the settlement agreement the Agarwals eventually signed with the Government in which they agreed to pay approximately $600,000 to settle the case.  *Id.* at 7; *see also Id.* Ex. 3. The CIS argues that Medicare fraud is "an extremely serious offense" which reflects badly on the perpetrator's moral character, and there can be little disagreement with that proposition.  *Id.* at 8. The issue here, however, is whether the settlement agreement is enough evidence to show conclusively, for the purposes of carrying a summary judgment motion, that the Agarwals were engaged in fraud and are unable to show good moral character.

Fraud crimes are dealt with in three separate places in the moral character regulations to which the CIS referred.  The first pertinent regulation is 8 C.F.R. § 316.10(b)(1)(ii), which states that an alien shall be found to lack good moral character if he has been convicted of an aggravated felony on or after November 20, 1990.  A fraud involving more than $10,000.00 is an aggravated felony for these purposes.  8 U.S.C. § 1101(a)(43)(M)(i).  This regulation does not apply to the instant Motion, however, because no conviction for fraud is alleged or proved.  The second pertinent regulation is 8 C.F.R. § 316(b)(2)(ii), which states that an alien shall be found to

-23-

lack good moral character if, during the statutory look-back period, he committed a crime involving moral turpitude for which he was convicted.  This regulation covers conduct that took place during the statutory period, even if the conviction was not handed down during that period.  *See Dang*, 488 F.3d at 1141; *see also United States v. Ekpin*, 214 F. Supp. 2d 707, 714 (S.D. Tex. 2002).  Again, since there is no conviction in this case, this regulation also does not apply.  A related clause states that an alien who admits to committing such an offense, though was never formally charged, indicted, arrested or convicted in connection with it, shall also be found to be lacking good moral character.  *See* 8 C.F.R. § 316(b)(2)(iv).  But again, the Agarwals stress that they never admitted to any wrongdoing in their settlement agreement, and the CIS does not allege or prove that they made such admissions anywhere else.  Pls.' Resp. 8; *see also* Defs.' Mot. Ex. 3 at 4.

The final regulation that touches upon fraud states that an alien is subject to a rebuttable presumption against good moral character if he committed unlawful acts during the statutory look-back that adversely reflect upon his moral character, even if those acts do not fall within the ambit of the preclusive regulations discussed above.  *See* 8 C.F.R. § 316(b)(3)(iii).  This regulation is broader than the previous ones for two reasons – it includes more types of conduct, and it does not *require* a conviction, though bad conduct not covered by the other regulations and proved through a conviction can be brought in under this regulation.[7]  *See Dang*, 488 F.3d at 1141.

---

[7]     If a conviction is not being used to prove the conduct alleged, it essentially allows and requires the body adjudicating the application to hold a mini-trial on the question, for the purposes ascertaining whether or not an alien has actually committed crimes that have gone unpunished, and whether such conduct should preclude citizenship.

The question therefore becomes whether the settlement agreement, though it contains an explicit disclaimer of any admission of fault, is sufficient evidence of a lack of moral character such that the CIS has carried its burden on summary judgment. The Court holds that it does not. As discussed below, mere allegations, or even allegations followed up by some external official action which seems to validate them to some degree, have not been held sufficient to uphold a grant of summary judgment in this setting.

The analogy to *Nyari v. Napolitano*, 562 F.3d 916 (8th Cir. 2009) is instructive. In that case, the alien applicant for citizenship, Mr. Nyari, had been accused of sexually abusing his daughters. *Id.* at 918. The allegations were raised in Virginia in 1988, and a year later, after an investigation, the local Department of Social Services (DSS) deemed them "founded" and entered them into a statewide database. *Id.* Mr. Nyari could have taken an administrative appeal from this action, but he did not appear at that hearing. *Id.* In the end, though, no criminal charges were brought and no conviction obtained. *Id.* He went on to apply for citizenship, and the CIS denied his application because of the sexual abuse allegations. *Id.* at 919. Appealing the CIS's denial of citizenship, Mr. Nyari sought review in federal district court, which went on to grant the agency's motion for summary judgment, holding that the allegations and the registry entry were sufficiently conclusive of the crime of sexual abuse, and that sexual abuse was a crime within the ambit of 8 C.F.R. § 316(b)(3)(iii). *Id.* (explaining that the district court characterized the failure fully appeal the registry entry as equivalent to a plea of "no contest"). The Court of Appeals reversed, holding that "Nyari's inclusion in the central registry and his failure to appear at the DSS hearing do not preclude him from demonstrating that he is a person of good moral character." *Id.* at 920-21 (holding also that the registry appeals process was a civil administrative

one, and that failing to pursue it is not equivalent to a criminal plea of "no contest" and not an admission of the conduct at issue). In the instant case, the existence of a settlement agreement which disclaims fault, coupled with no other evidence of the alleged bad act, is even less of an admission of or proof of a crime. It should not be found to prove conclusively that the Agarwals committed fraud and are thus ineligible for citizenship. Medicare fraud is a serious charge, but on the present record, this charge must be left for trial.

## III.    CONCLUSION

For the foregoing reasons, the Court finds that the purported agency adjudications of May 4, 2009, are void because this Court had exclusive jurisdiction over the Agarwals' applications at that point. Accordingly, those adjudications are vacated, and the Court finds that the Agarwals had no need to take administrative appeals from those adjudications. For this reason, too, the Court finds that this suit is not moot. The Court also finds that the institution of removal proceedings against the Agarwals would force this Court to stay further proceedings in this case, but that the CIS has not adequately alleged or proved that such proceedings have in fact been instituted. The Court also finds that the Agarwals are not rendered ineligible for citizenship because they lack lawful permanent resident status, rejecting the theory that they never had it, and also rejecting the theory that they once had it but that it was validly revoked. Finally, the Court also finds that the CIS has not sufficiently shown, for the purposes of summary judgment, that the Agarwals are ineligible for citizenship because they are unable to demonstrate good moral character; instead, that issue is ripe for trial.

Accordingly, Defendants' Motion is **DENIED**, and the decisions of United States Citizenship and Immigration Services, dated May 4, 2009, denying the naturalization petitions of

Ajai and Divya Agarwal, are hereby **VACATED** as *ultra vires*.  An amended Trial Preparation

Order shall issue simultaneously with this Order.

      **SO ORDERED**.

      **SIGNED** on this 9th  day of October, 2009.

_____
KATHLEEN CARDONE
UNITED STATES DISTRICT JUDGE